**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Brian Alvin Mensing,

Plaintiff,

v.

Jacob Price, acting in his individual capacity as an officer of the Mankato Police Department, and the City of Mankato,

Defendants.

Case No. ______________

**COMPLAINT**

**JURY TRIAL DEMANDED UNDER FRCP 38(b)**

---

For his Complaint, Plaintiff Brian Alvin Mensing ("Mensing") states and alleges as follows:

1. This is an action for money damages and for nonmonetary relief, in the form of discipline and training, for injuries sustained by Mensing as a result of the excessive use of force by Defendant Jacob Price ("Price"), a Mankato, Minnesota police officer. Price's conduct violated Mensing's well-settled federal rights while acting under the color of state law.

2. Mensing brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth Amendments of the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3). The aforementioned statutory and constitutional provisions confer original jurisdiction of this Court over this matter. State law claims and, by consequence, the limitations and defenses under state law are not applicable to this civil-rights lawsuit.

3. Mensing was, at all times material herein, a citizen of the United States, a resident of the City of Mankato, and employed full-time by the State of Minnesota Department of Transportation as a winter snowplow driver, with other tasks assigned seasonably.

4. Upon information and belief, Defendant Price was, at all times material herein, a citizen of the United States and a resident of the State of Minnesota, duly appointed and acting as an officer of the Mankato Police Department ("MPD").

5. Defendant City of Mankato is a municipality duly incorporated under the laws of the State of Minnesota.

## THE JANUARY 10, 2019 INCIDENT

6. On the evening of January 10, 2019, Mensing traveled to the Underground Bar located at 12 Entertainment Alley in Mankato, arriving at approximately 10:00 pm.

7. Because he planned to drink, Mensing consciously decided *not* to drive; he took a cab to the Underground Bar and planned to take one home.

8. After drinking for a time, Mensing walked across Cherry Street to the La Bamba Taqueria ("La Bamba"), located at 501 South Front Street.

9. There, Mensing paid for and enjoyed some food. Though he was intoxicated, he did not cause any type of disturbance or otherwise disrupt business at La Bamba.

10. Nevertheless, according to MPD reports, at 10:50 pm officers were dispatched to La Bamba on a report of an intoxicated male.

11. The MPD reports indicate that someone had advised that a male "was passed out in the restaurant and they needed assistance in removing him from the establishment."

12. MPD officer Jeff Fischbach ("Fischbach"), badge number 3138, was the first officer to arrive, at approximately 10:51:54 pm.

13. Fischbach did not activate the lights or siren on his squad car when driving to La Bamba. His dashboard mounted camera ("dashcam") was active and captured some video and audio of the relevant events.

14. According to his dashcam video, Fischbach parked his squad car on Front Street directly in front of La Bamba and then slowly exited and walked towards the restaurant. As he did so, he interacted with another individual who informed Fischbach, "drunk guy . . . I'm afraid to wake him up," but "he's not doing anything [inaudible]."

15. At no time did any La Bamba employees claim that Mensing had committed a crime or was trespassing.

16. Around that time, MPD officer Kelly Wood ("Wood"), badge number 3134, also arrived at La Bamba.

17. Like Fischbach, Wood did not activate the lights or siren on her squad car when driving to La Bamba.[1]

18. This is consistent with a benign, non-criminal interaction with the public.

19. According to Wood's dashcam video, she also parked directly in front of La Bamba (immediately behind Fischbach's squad car) and walked inside, arriving moments after Fischbach.

---

[1] Wood's dashcam also captured some video and audio of the relevant events. Though the quality of the audio from the dashcam videos is poor, at least some is discernible. But because the squad cars were parked facing away from La Bamba, little relevant video was captured.

20. Each of the officers was in uniform and outfitted with a full complement of police gear.

21. After the officers entered La Bamba, they approached Mensing and asked him to wake up. Mensing did so.

22. Fischbach then asked Mensing for identification and asked his name. Mensing replied, "Brian."

23. Fischbach asked Brian his last name, and he replied "Mensing." The officers, however, apparently heard "Mending."

24. Wood then radioed dispatch to check the name "Brian Mending." Because they had misunderstood Mensing's name, no matching records were found.

25. As he had not done anything wrong, Mensing asked the officers, "What did I do?"

26. Fischbach told Mensing the officers were there because they needed to "figure out how much [he'd had] to drink."

27. Wood told Mensing the officers had been called to the restaurant because he was "passed out here" and they had a "duty to make sure you're okay and safe to be by yourself."

28. Neither officer indicated that Mensing had broken any laws.

29. Fischbach and Wood then asked Mensing to step outside.

30. Mensing told them he wanted to make a phone call, and he then stood up to exit La Bamba, as he had been instructed.

31. According to his later-filed Narrative Report, around this time Defendant Price, badge number 3137, arrived at La Bamba.[2] From records made available by MPD, it is unclear whether Price arrived on foot or by car. According to MPD, however, no dashcam video from Price exists.

32. Price, too, was in full uniform when he arrived at La Bamba and outfitted with a full complement of police gear.

33. Price entered La Bamba, where he found Fischbach and Wood speaking with Mensing, who was then standing.

34. The officers again asked Mensing for identification and instructed him to remove it from his pocket. When Mensing asked why, one of the male officers replied that he wanted to look in Mensing's pockets because they were "having a hard time identifying" him and Mensing was "not listening to [the officers]."

35. Mensing responded by telling the officers they were being ridiculous, as he had done nothing wrong.

36. At this point, Mensing made a phone call to his mother, told her where he was, and asked her to come pick him up.

37. The officers then instructed Mensing to step outside of La Bamba.

38. Price's Narrative Report noted that Mensing "proceeded to comply by walking toward the exit." Wood's Narrative Report, however, falsely claimed that Mensing was "not receptive or compliant with verbal commands."

---

[2] MPD has provided "Narrative" Reports from Price and Wood, a "Subject Aggression/Resistance" Report from Price, and a "Detoxification" Report from Fischbach. Fischbach apparently did not file a "Narrative" Report regarding the events culminating in Mensing's arrest.

39. In reality, Mensing had been completely cooperative with the officers and complied with all of their commands to that point, including identifying himself, standing to exit La Bamba, and walking towards the door. Indeed, in Fischbach's Detoxification Report, the boxes labeled "Cooperative" and "Talkative" were checked in the "Attitude" section.[3]

40. Nevertheless, Price and Wood claimed in their Reports that, at this point, Mensing suddenly turned resistant as they were guiding him by the arms towards the exit.

41. Wood, for example, claimed in her Narrative Report that Mensing "immediately tensed up" when she "grabbed" his arm. She offered no further explanation for Mensing's alleged resistance or any indication he had committed a crime.

42. Price's Narrative Report indicates that he "took hold of [Mensing's] left arm and [] told him that he needed to walk out of the establishment with us."

43. Price's Report then claims that Mensing "pull[ed] away" and Price lost hold of him. Notably, nowhere in Wood's Report does she mention that Mensing pulled away from any of the officers.

44. Nevertheless, Price's Report then claims that he "immediately regained control" of Mensing's left arm, but Mensing "tensed up," without further description.

45. "Tensing up" is often a pretextual justification for the use of force, especially when left uncharged.

46. Price's Report claims that Mensing then "grabbed onto the counter and used it as leverage to prevent officers from making him walk." Wood's Report nowhere mentions Mensing grabbing onto a counter.

---

[3] Confusingly, Fischbach also checked the box labeled "Belligerent."

47. Price reported that Mensing was becoming "increasingly agitated with law enforcement" at this juncture and was "taking steps to physically prevent officers from escorting him outside." Upon information and belief, Price wrote this in his Narrative Report in a *post hoc* attempt to justify the excessive and unreasonable force he applied to Mensing.

48. Indeed, in his Subject Aggression/Resistance Report, Price indicated only "verbal non-compliance" and "*passive* resistance." He further indicated he used force in "self-defense," despite Mensing at no time posing any threat to the officers or anyone else.

49. Price's Narrative Report states that "due to [Mensing's] actions," he "placed [Mensing's] left arm in an iron wrist lock and applied pressure to his wrist in order to gain compliance."

50. Price applied sufficient pressure with his "iron wrist lock" to cause a complex fracture of Mensing's left wrist.

51. Wood, meanwhile, directed Mensing's right wrist behind his back, and the officers then handcuffed him.

52. Almost immediately, Mensing began to complain of pain and told the officers that they had broken his left wrist. He told the officers he had previously undergone surgery on that wrist and they had broken it even though he had done nothing wrong.

53. The three officers walked Mensing out of La Bamba and towards the rear of Fischbach's squad car. On the dashcam videos, Mensing can be seen and heard talking and walking in a calm, compliant, and non-belligerent manner from La Bamba to the car, with his hands cuffed behind his back.

54. Mensing repeatedly told the officers that he was in great pain and asked them to remove the handcuffs. One of the male officers declined, derisively telling Mensing, "They're not made for comfort."

55. That same officer told Mensing, "This all could have been avoided by cooperation." Mensing replied, "I cooperated. I'm sorry, but I did."

56. The officers directed Mensing into the rear seat of Fischbach's squad car, which is an area captured on dashcam video.

57. On the video, Mensing can be seen repeatedly squirming and moving around in an effort to avoid leaning or sitting on his hands, as he was in great pain.

58. Mensing repeatedly advised Fischbach that his wrist hurt and asked to have the handcuffs removed. Fischbach refused.

59. Instead, Fischbach proceeded to drive Mensing to the Mankato Public Safety Center. Once there, according to Wood's Narrative Report, Mensing stated that he was "experiencing sharp pains in his wrist."

60. Wood also noted that Mensing's left wrist was "obviously swollen." Price, too, noted in his Narrative Report that Mensing's left wrist was swollen.

61. Indeed, "swollen" was an understatement, as the photo below (taken at the Public Safety Center) demonstrates Mensing's anatomically misshapen wrist:



62. Mensing's mother, Mary, was contacted and came to the Public Safety Center to pick up Mensing.

63. Mensing was never charged with a crime in connection with the events of January 10.

## MENSING'S INJURY AND SUBSEQUENT MEDICAL TREATMENT

64. Upon being released, Mary immediately transported Mensing to the Mayo Clinic Health System Emergency Department at the Mankato Clinic. They arrived at approximately 11:37 pm on January 10.

65. There, an X-ray was performed, which revealed an acute volar displaced fracture of the distal left radius and ulnar styloid process, reverse Colles' fracture, as depicted in the circled area below:



66. In other words, exactly what Mensing had told the officers at La Bamba was true: Price had fractured Mensing's left wrist.

67. Mensing was given a sling and discharged with instructions to urgently follow up – within the next two days – with the Mankato Orthopedic & Fracture Clinic, where he had previously undergone wrist surgery.

68. At 1:30 pm on January 11, 2019, Mensing was evaluated by orthopedic surgeon Jesse Botker, MD, at the Orthopedic & Fracture Clinic.

69. Dr. Botker noted no significant displacement of the fracture and therefore decided to keep Mensing in a sling for a week, with the hope of then transitioning him to a cast. However, Dr. Botker noted that "[i]f there is displacement of the fracture" in a week's time, then "open reduction internal fixation" – surgery – "may be necessary."

70. Mensing returned to see Dr. Botker one week later, on January 18, 2019. Physical exam showed reduced swelling but significant angular deformity of the left distal radius.

71. X-rays taken that day confirmed increased displacement of the left distal radius fracture with apex dorsal angulation.

72. Given the increased displacement of the fracture, open-reduction surgery was necessary.

73. Dr. Botker performed "ORIF" (open reduction internal fixation) surgery on Mensing's left wrist on January 24, 2019.

74. To perform the surgery, Dr. Botker first made a standard volar incision over the flexor carpi radialis tendon. The tendon sheath was opened, and the flexor carpi radialis was retracted.

75. Next, Dr. Botker identified and retracted the flexor pollicis longus muscle belly, and the pronator quadratus was taken off the radial-most insertion.

76. The first dorsal compartment was then opened, and fibrous tissue was removed, freeing the fracture. Dr. Botker then reduced the fracture by drilling holes in bone, placing wires, and ultimately putting a plate into the wrist, which was screwed down into place. Sutures were applied and the arm was placed into a splint.

77. Following the surgery, Mensing went through several months of painful physical therapy on his left wrist. He was unable to work for an extensive period of time – including during the busy winter snowplow season, causing him to miss out on overtime that he routinely earned during the winter months.

## THE UNNECESSARY AND EXCESSIVE FORCE UNDER THE CIRCUMSTANCES

78. The force Price used on Mensing was unauthorized, excessive and constitutionally improper.

79. Mensing had not committed any crime on the evening of January 10, 2019. He was not charged with a crime following the incident.

80. Mensing never threatened anyone; nor did he pose an immediate threat to the safety of Price, Fischbach, Wood, or anyone else during the encounter at La Bamba.

81. Mensing complied with the officers' commands.

82. Mensing did not attempt to resist arrest or to evade arrest by flight.

83. Mensing was surrounded by three armed and trained police officers, while he had no weapon, nor any plausible access to one.

84. As a result of the excessive force by Price, Mensing sustained serious and permanent injuries to his left wrist.

85. Mensing has significant, permanent scarring on his left arm due to the necessary treatment of his injuries.

86. Since January 10, 2019, Mensing has incurred special damages, including medical expenses totaling more than $27,000, as a direct and proximate result of Price's excessive use of force and unreasonable seizure.

87. Mensing will continue to incur other special damages, including future medical expenses, past and future lost wages and other items of damage.

88. Mensing has in the past and will in the future experience physical and mental pain and suffering related to Price's unconstitutional conduct on January 10, 2019.

89. Mensing demands a jury trial as to all issues of fact herein.

**COUNT ONE**
**42 U.S.C. § 1983**
**EXCESSIVE FORCE – FOURTH AND FOURTEENTH AMENDMENTS**
***Plaintiff v. Defendant Price***

90. Mensing realleges each of the preceding paragraphs as if fully stated herein.

91. By the actions described above, Defendant Price, under the color of state law, violated and deprived Mensing of his clearly established and well-settled right to be free from the use of excessive force, in violation of the Fourth and Fourteenth Amendments.

92. Mensing sustained a comminuted distal radius fracture as a direct and proximate result of Defendant Price's unconstitutional use of force and was thereby damaged in an amount yet to be determined.

93. Punitive damages are available against Defendant Price and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minnesota Statutes § 549.20.

94. Mensing is entitled to recovery of costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

**COUNT TWO**
**42 U.S.C. § 1983**
**FAILURE TO TRAIN UNDER *CITY OF CANTON V. HARRIS***
***Plaintiff v. Defendant City of Mankato***

95. Mensing realleges each of the preceding paragraphs as if fully stated herein.

96. Upon information and belief, before January 10, 2019, the City of Mankato intentionally, knowingly, recklessly or with deliberate indifference to the rights of citizens, failed to properly train Defendant Price in the constitutionally proper use of force.

97. Absent proper training, continued monitoring, and discipline of its officers, including Defendant Price, it is foreseeable that instances of excessive force will occur.

98. As a direct and proximate result of the acts and omissions by the City of Mankato, Mensing suffered severe and permanent injuries, was forced to endure great pain and mental suffering, and was damaged in an amount to be determined by the jury.

99. Mensing is entitled to recovery of costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brian Alvin Mensing prays for judgment against Defendants as follows:

1. That this Court find that Defendants Price and the City of Mankato committed acts and omissions violating the United States Constitution, actionable under 42 U.S.C. § 1983;

2. As to Count One, a money judgment against Defendant Price for compensatory and punitive damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and pre-judgment interest;

3. As to Count Two, a money judgment against the City of Mankato for compensatory damages in an amount to be determined by the jury, together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and pre-judgment interest;

4. For an order mandating changes in the training, policies, and procedures of the Mankato Police Department in the appropriate use of force and requiring, among other things, discipline for the use of such excessive force executed by Defendant Price on January 10, 2019; and

5. For such other and further relief as this Court deems just and equitable.

**GASKINS BENNETT & BIRRELL LLP**

Date: August 16, 2019

s/Robert Bennett
Robert Bennett, #6713
Andrew J. Noel, #322118
Kathryn H. Bennett, #0392087
Marc E. Betinsky, #0388414
333 South Seventh Street, #3000
Minneapolis, MN 55402
Telephone: 612-333-9500
rbennett@gaskinsbennett.com
anoel@gaskinsbennett.com
kbennett@gaskinsbennett.com
mbetinsky@gaskinsbennett.com
*Attorneys for Plaintiff*